No. 104,083

State of Kansas, *Appellee*, v. Stephen Bernard Foster, *Appellant*.

(312 P.3d 364)

Opinion filed November 15, 2013.

*Heather Cessna*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jason E. Geier*, assistant district attorney, argued the cause, and *Darren E. Root*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: A jury convicted Stephen Bernard Foster of certain offenses that included the crime of forgery based upon his attempt to cash a $350 check at CheckSmart. The Court of Appeals affirmed the forgery conviction in a published opinion: *State v. Foster*, 46 Kan. App. 2d 233, 264 P.3d 116 (2011). In reaching its decision, the panel rejected Foster's argument that the terms "issuing or delivering" in K.S.A. 21-3710(a)(2) establish alternative means of committing forgery and that the State had failed to present sufficient evidence that Foster *issued* the forged check. We granted review of the Court of Appeals decision, in part to resolve any conflict with another panel's decision in *State v. Owen*, No. 102,814, 2011 WL 2039738 (Kan. App. 2011) (unpublished opinion), *rev. granted* February 17, 2012, regarding the alternative means of committing forgery.

We find that the legislature did not intend to create alternative means of committing forgery through its use of the "issuing or delivering" language in K.S.A. 21-3710(a)(2). Consequently, the State did not have to present evidence that Foster both issued the check and delivered the check; the existence of substantial competent evidence to establish that Foster delivered a fraudulent check knowingly and with intent to defraud was sufficient to support the forgery conviction. Therefore, we affirm the Court of Appeals' decision that upholds Foster's forgery conviction.

## FACTUAL AND PROCEDURAL OVERVIEW

On October 8, 2008, Foster attempted to have CheckSmart cash a $900 check, payable to Foster and drawn on the account of Affordable Paintball. Foster told CheckSmart employee Kajsa Freed that he had received the check for work he had done for Affordable Paintball. Freed testified that CheckSmart requires that, before cashing a check, an employee must contact the person who wrote the check and verify the check number, the amount, and the person to whom the check is written. The company also requires the person attempting to cash the check to fill out a form with his or her personal information. Following this procedure, Freed attempted to contact Affordable Paintball but could not reach a representative. She left two messages for the company and advised Foster that she could not cash the check without verification from the maker.

The next day, Affordable Paintball's owner contacted CheckSmart and told the company not to cash checks drawn on Affordable Paintball's account because the checks had been stolen. Therefore, when Foster returned later that day with another check, in the amount of $350, drawn on Affordable Paintball's account, Freed contacted her manager, and the manager called the police. Freed kept Foster at CheckSmart until the police arrived by asking Foster to wait until she and her manager could verify the check. After approximately 10 minutes, the police arrived and arrested Foster. During a search incident to arrest, police found marijuana in Foster's keychain.

The State charged Foster with forgery, attempted theft, possession of marijuana, and possession of drug paraphernalia. At the ensuing jury trial, Affordable Paintball's owner testified that his business checkbook had been stolen from his home and that the $350 check in Foster's possession was one of the stolen checks. He denied writing, signing, or dating the check. He also testified that he did not know Foster, that Foster had never worked for him, and that he did not owe money to Foster.

Two police officers who responded to CheckSmart's call and a detective who interviewed Foster also testified. According to the responding officers, Foster explained that he had received the $350 check for doing lawn work. Foster also told one of the responding officers that he had no knowledge that the check was forged or stolen. Foster explained to the detective that he had agreed to cash the checks as a favor for a friend, Randy Ridens. Foster also told the detective that he was to receive one-third of the proceeds for cashing the checks.

Foster defended at trial on the basis that he did not know the checks were stolen. His trial testimony laid the blame on Ridens. Specifically, Foster said that Ridens owed him $350 for yard and automobile work and that Ridens came to Foster's home with a $900 check from Affordable Paintball made payable to Foster. According to Foster, Ridens told him that he worked for Affordable Paintball and had the check made payable to Foster in order to satisfy his debt to Foster. Foster testified that CheckSmart could not cash the $900 check because he arrived after 5 p.m. and CheckSmart could not reach a representative at Affordable Paintball or the bank. Foster said he returned the $900 check to Ridens, asking for a different check in the exact amount owed to him. He said that Ridens brought him a $350 payroll check the next day, which Foster took to CheckSmart to cash, only to be arrested by the police. Foster claimed that Ridens did not tell him that the check was bad and that Foster never intended to defraud anyone.

The State presented Ridens as a rebuttal witness, who testified pursuant to an immunity agreement. Ridens said that his friend, Kasey Ferguson, wrote the two checks in question. Ridens said he observed Ferguson give Foster the $350 check with the promise

that Foster would receive half of the proceeds from cashing the check. Ridens denied that he ever worked for Affordable Paintball, and he declared that Foster was aware that the $350 check was not a payroll check and was stolen.

The jury convicted Foster on all counts, albeit the district court later granted Foster's motion for acquittal on the paraphernalia conviction. The Court of Appeals affirmed Foster's convictions and sentences. This court granted review on the sole issue of the sufficiency of the evidence to support the forgery conviction.

## ALTERNATIVE MEANS

The overarching question presented involves the sufficiency of the evidence to support the forgery conviction, which does not require us to engage in a preservation inquiry. See *State v. Cheffen*, 297 Kan. 689, 699-700, 303 P.3d 1261 (2013) (quoting *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 [2008]) (" 'There is no requirement that a criminal defendant challenge the sufficiency of the evidence before the trial court in order to preserve it for appeal.' "). But the scope of the test for evidence sufficiency depends upon whether the jury was instructed that Foster was charged with having committed forgery by only one statutory means that was susceptible to being proved in different ways, or whether the jury was instructed that Foster was charged with having committed forgery by two or more distinct alternative means by which the legislature has said the crime can be committed. See *State v. Brown*, 295 Kan. 181, 194, 284 P.3d 977 (2012) (alternative means are legislatively determined, distinct, material elements of crime, as opposed to legislative descriptions of material elements or factual circumstances that would prove the crime).

In *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994) (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]), this court established that " '[W]here a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means.' " The requirement that the record contain sufficient evidence from which

a rational factfinder could have found the defendant guilty on each and every alternative means was later dubbed "super-sufficiency." Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 283, 294, 296-99 (2005). Recently, the majority in *State v. Wright*, 290 Kan. 194, 201, 206, 224 P.3d 1159 (2010), reiterated that jury unanimity is statutorily required in Kansas and explained that the alternative means rule and super-sufficiency requirement emanating from *Timley* "is the only choice to ensure a criminal defendant's statutory entitlement to jury unanimity."

Accordingly, Foster claims that he was deprived of his statutory right to a unanimous jury verdict because the State charged him with, and the court instructed the jury on, two different ways in which a person can commit forgery under the statutory provisions of K.S.A. 21-3710(a)(2), *i.e.*, *issuing* a forged instrument or *delivering* a forged instrument, and the State presented no evidence that he issued the forged check. The State counters that *Timley's* super-sufficiency rule is not applicable here, because "issuing or delivering" are not truly alternative means of committing forgery. We agree.

*Standard of Review*

"Issues of statutory interpretation and construction, including issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal." *Brown*, 295 Kan. 181, Syl. ¶ 6.

*Analysis*

When embarking upon an exercise in statutory interpretation, it is normally helpful to begin with a recitation of the language to be construed. Germane to the task at hand, the legislature has ascribed the following definitions to the crime of forgery in K.S.A. 21-3710, with our emphasis added:

"(a) Forgery is knowingly and with intent to defraud:

"(1) Making, altering or endorsing any written instrument in such manner that it purports to have been made, altered or endorsed by another person, either real or fictitious, and if a real person without the authority of such person; or altering any written instrument in such manner that it purports to have been made at

another time or with different provisions without the authority of the maker thereof; or making, altering or endorsing any written instrument in such manner that it purports to have been made, altered or endorsed with the authority of one who did not give such authority;

"(2) *issuing or delivering* such written instrument knowing it to have been thus made, altered or endorsed; or

"(3) possessing, with intent to issue or deliver, any such written instrument knowing it to have been thus made, altered or endorsed." (Emphasis added.)

Foster contends that by using two terms—"issuing or delivering"—separated by the disjunctive "or" in K.S.A. 21-3710(a)(2), the legislature manifested its intent to create alternative means. Recently, we eschewed such simplicity and declared that "[i]dentifying an alternative means statute is more complicated than spotting the word 'or' " because " '[t]he mere use of a disjunctive in a statute does not an alternative means crime make.' " *Brown*, 295 Kan. at 193 (quoting *State v. Peterson*, 168 Wash. 2d 763, 770, 230 P.3d 588 [2010]). Instead, *Brown* set forth the following guidance for determining whether a statute involves alternative means:

"In examining legislative intent, a court must determine for each statute what the legislature's use of a disjunctive 'or' is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea, actus reus,* and, in some statutes, a causation element? Or is it to merely describe a material element or a factual circumstance that would prove the crime? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction. See *Wright*, 290 Kan. at 201 (*'Timley* required sufficiency of evidence to support each alternative means *upon which a jury is instructed,* in order to protect a criminal defendant's right to a unanimous jury verdict.' [Emphasis added.]); see also *Peterson,* 168 Wash. 2d at 769 (focus of the alternative means rule is on the jury instructions)." 295 Kan. at 194.

*Brown* further opined that the legislature typically signals its intent to state alternative means through statutory structure, "separating alternatives into distinct subsections of the same statute," albeit such separation is not always present. 295 Kan. at 196. Regardless of the statutory structure, the legislature may list multiple descriptors within a single means of committing a crime that *Brown*

labeled "options within a means." 295 Kan. at 196. These options within a means "signal secondary status" and are not "alternative means themselves if they do not state additional and distinct ways of committing the crime, that is, if they do not require proof of at least one additional and distinct material element." 295 Kan. at 196-97. For guidance on how to analyze whether additional options are alternative means as opposed to options within a means, *Brown* discussed Washington caselaw after noting that Kansas' alternative means caselaw was based on a similar super-sufficiency requirement imposed by courts of that State. 295 Kan. at 198-99. In distinguishing material elements of the crime from secondary matters, the Washington courts have "determined that options do not state alternative means if the language merely (a) defines other statutory language in a way that elaborates on or describes a material element or (b) describes factual circumstances that prove the crime." *State v. Ultreras*, 296 Kan. 828, 849, 295 P.3d 1020 (2013) (citing *Brown*, 295 Kan. at 198-200).

The Court of Appeals examined the structure of K.S.A. 21-3710(a) and opined that "the legislature intentionally segregated what it intended to be three alternative means of committing forgery—creating [subparagraph (a)(1)], transferring [subparagraph (a)(2)], and possessing [subparagraph (a)(3)] a fraudulent instrument—into three different subsections." *Foster*, 46 Kan. App. 2d at 241. Although we disagree with the label the panel assigned to the alternative means set forth in subparagraph (a)(2), we agree that the structural separation of the forgery statute into three distinct subparagraphs signals a legislative intent to create three alternative means of committing the crime.

Reading the entire provision leads to the singular conclusion that one commits forgery under K.S.A. 21-3710(a)(1) by *creating* a forged instrument; that one commits forgery under subparagraph (2) by *offering* an instrument known to be a forgery (by whomever created); and that one commits forgery under subparagraph (3) by knowingly *possessing* a forged instrument (by whomever created) with the intent to offer it. The disjunctive phrases, "making, altering or endorsing" in subparagraph (1), and "made, altered or endorsed" in the other two subparagraphs, simply describe ways in

which a forged instrument can be created. The disjunctive phrases, "issuing or delivering" and "issue or deliver," which are contained in subparagraphs (2) and (3), respectively, simply describe ways in which a person can offer a forged instrument.

The foregoing assessment of the forgery statute is consistent with this court's prior observation in *State v. Norris*, 226 Kan. 90, 595 P.2d 1110 (1979). The defendant in *Norris* argued that K.S.A. 21-3710 (Weeks 1974) was unconstitutionally vague and indefinite. The *Norris* court found that the forgery statute's provisions "convey sufficiently definite and certain warnings as to the conduct proscribed when measured by common understanding and practice." 226 Kan. at 93. Enroute to its constitutionality holding, *Norris* opined: "The forgery statute, K.S.A. 21-3710, prohibits *three different types of conduct* connected with forged instruments when such conduct is purposeful and with intent to defraud. The first type of conduct is listed under [(a)(1)] . . . . The second is listed under [(a)(2)] . . . . The third is listed under [(a)(3)] . . . ." (Emphasis added.) 226 Kan. at 92. Apparently, the *Norris* court did not view the disjunctive phrases within each subparagraph as creating separate and distinct criminal conduct.

The Court of Appeals found additional support for its holding by looking to the Kansas Uniform Commercial Code (UCC), K.S.A. 84-1-101 *et seq.*, reasoning that the UCC's definitions with respect to negotiable instruments would be instructive because forgery involves written instruments. *Foster*, 46 Kan. App. 2d at 238. Specifically, the panel looked to K.S.A. 84-3-105(a) for a definition of "issue," namely: " '[T]he first delivery of an instrument by the maker or drawer . . . for the purpose of giving rights on the instrument to any person.' " 46 Kan. App. 2d at 238. The panel also referred to K.S.A. 2008 Supp. 84-1-201(15) for a general definition of "delivery," and ultimately concluded that the "UCC definitions for issuing and delivering a negotiable instrument readily demonstrate that each of these acts is related to transferring possession of a negotiable instrument that already has been created, whether it is the first or a subsequent transfer." 46 Kan. App. 2d at 240-41.

Foster complains that the panel should not have used the UCC provisions, which are designed to govern the conduct of business

in the civil context, to define legislative intent in a criminal statute. He points out that K.S.A. 84-3-103(b) specifically notes that the definition of "issue" under K.S.A. 84-3-105(a) applies "to this article," which refers to Article 3 of the UCC governing negotiable instruments.

Foster's point is well taken. The UCC addresses a unique and specialized area of the law, and its provisions do not always translate precisely into other areas. Moreover, the UCC's definition of "negotiable instrument" applies only to "an unconditional promise or order to pay a fixed amount of money" and requires some very specific conditions. K.S.A. 84-3-104(a). In contrast, the forgery statute applies to "written instruments," which the criminal code defines in very broad and general terms. See K.S.A. 2008 Supp. 21-3110(26) (defining written instrument); see also *State v. Gotti*, 273 Kan. 459, 43 P.3d 812 (2002) (finding that defendant should have been charged with forgery when defendant created false sale and return of merchandise receipt to give to his girlfriend); *State v. Meyer*, 17 Kan. App. 2d 59, 62-63, 832 P.2d 357 (1992) (finding rental information sheet was "[w]ritten instrument" under K.S.A. 1991 Supp. 21-3110[25]); see also 36 Am. Jur. 2d, Forgery § 33, p. 617 ("The crime of forgery covers nearly every class of instruments known to the law as affecting private or public rights."); 37 C.J.S., Forgery § 16 (stating that generally, "any writing which may defraud or prejudice another, or which if genuine would have legal effect or would operate as the foundation of another man's liability or the evidence of his or her right, . . . may be the subject of forgery" and noting that "[i]n the absence of a statutory requirement, the instrument need not be one that creates, increases, diminishes, destructs, or defeats any pecuniary obligation"); 37 C.J.S., Forgery §§ 20-29 (discussing variety of instruments that can be subject of forgery, including deeds, mortgages, wills, and public records).

Consequently, while the legislature's definitions in the UCC might provide some insight into what the legislature means in its criminal statutes, they are not determinative. In this case, we find the legislative history of the forgery statute to be more instructive.

In 1969, our legislature repealed the entire criminal code and enacted a new code, including a new version of K.S.A. 21-3710 containing the relevant "issuing or delivering" language. L. 1969, ch. 180, sec. 21-3710; see *State v. Trudell*, 243 Kan. 29, 32, 755 P.2d 511 (1988). Our Judicial Council noted that two of its objectives in revising the criminal code were:

> "*First*; to remove duplications, inconsistencies, invalid provisions and obsolete materials;
>
> "*Second*, to state in clear, simple and understandable terms the elements of the prohibited acts. An attempt has been made to define each crime in language sufficiently specific that the individual who reads the statute can readily understand the conduct that is prohibited and, at the same time, to avoid the enumeration of specific acts which might exclude other conduct equally harmful but not thought of at the time the enumeration was made. By defining each crime in forthright, simple terms it is hoped that undue technicality in the administration of criminal justice may be avoided." Kansas Judicial Council Bulletin, pp. 7-8 (April 1968).

The need to consolidate and clarify was particularly obvious with respect to forgery. Prior to the 1969 revisions, Kansas criminal law contained more than 20 sections addressing some aspect of forgery. See K.S.A. 21-3710, Source or prior law; Kansas Judicial Council Bulletin, pp. 70-71 (April 1968). K.S.A. 21-3710(a)(2) is similar to former statutes K.S.A. 21-609 (Corrick 1964), K.S.A. 21-614 (Corrick 1964), and K.S.A. 21-621 (Corrick 1964), describing uttering or passing instruments, writings, and coins. The former statutes contained a variety of terms describing uttering or passing. See K.S.A. 21-609 (Corrick 1964) (entitled "uttering or passing instruments described in 21-608"; illegal to "sell, exchange or deliver, or offer to sell, exchange or deliver, or receive upon a sale, exchange or delivery"); K.S.A. 21-614 (Corrick 1964) (entitled "uttering or passing coins described in 21-613"; illegal to "sell, exchange or deliver, or offer to sell, exchange or deliver, or receive upon any sale, exchange or delivery"); K.S.A. 21-621 (Corrick 1964) (entitled "Passing, uttering or publishing counterfeit coins"; illegal to "pass, utter or publish, or offer or attempt to pass, utter or publish"); see also *State v. White*, 207 Kan. 800, 801, 486 P.2d 1381 (1971) ("Essential elements of the crime [under K.S.A. 21-621 (Corrick 1964)] are that the instrument was forged [whether forged by the accused

or some other person] and that the accused knew it was a forgery at the time he attempted to utter and pass the instrument."); *State v. Fick*, 204 Kan. 422, 424, 464 P.2d 271 (1970) ("The offense of uttering under K.S.A. 21-609, as applied to this case, is the exchanging or delivering of a forged instrument, as defined in 21-608, knowing the same to be falsely made or forged.").

It appears that the legislature replaced the more archaic phrase "uttering or passing" with the phrase "issuing or delivering." The common-law offense of uttering a forged instrument has been defined as "the offering of a forged instrument to another, knowing it to be forged, with intent to defraud." 4 Wharton's Criminal Law § 494, p. 99 (15th ed. 1996). In other words, uttering a forged document did not require the actual transfer of possession. Consequently, unless the legislature intended to change the nature of the crime of forgery when it revised the criminal code, the Court of Appeals was incorrect in its interpretation that issuing or delivering under K.S.A. 21-3710(a)(2) requires an actual transfer of possession.

The forgery statute adopted by the legislature in the 1969 revision of the criminal code was identical to the one proposed by the Judicial Council. See Kansas Judicial Council Bulletin, p. 70 (April 1968); L. 1969, ch. 180, sec. 21-3710. In turn, the Judicial Council's comment noted that its draft was similar to Illinois' forgery statute. Kansas Judicial Council Bulletin, p. 70. Illinois courts hold that the language in that state's forgery statute does not limit forgery prosecutions to the commercial definitions contained in the UCC. See *The People v. Epping*, 17 Ill. 2d 557, 568-69, 162 N.E.2d 366 (1959) ("The test of an endorsement in a forgery trial is not its legal sufficiency to constitute a valid endorsement under the Negotiable Instruments Act but, rather, the inquiry is to ascertain whether the endorsement renders the instrument capable of defrauding and is made for that purpose."); *People v. Stevens*, 128 Ill. App. 3d 823, 825, 471 N.E.2d 581 (1984) (holding that "issue," as it appears in combination with "deliver" in forgery statue, is not limited to first delivery and therefore declining to apply definition of "issue" contained in UCC).

Moreover, Illinois interprets the word "utter" to mean "to offer," and its appellate court has opined that the legislature did not intend to change the meaning of its forgery statute when it replaced such words as "utter" with "issues" or "delivers."

"[T]he various statutes dealing with forgery have been codified by section 17-3 of the Criminal Code of 1961; *the drafters did not intend to change the law, however.* (Ill. Ann. Stat., ch. 38, par. 17-3, Committee Comments, at 280-81 (Smith-Hurd 1977).) Thus, section 17-3 uses two pairs of general terms—'makes or alters' and 'issues or delivers'—in place of the virtual thesaurus formerly spread over six separate statutes. (Ill. Rev. Stat. 1961, ch. 38, pars. 151 ('issues or passes' currency), 277 (to 'make, alter, forge or counterfeit' or 'utter, publish, pass or attempt to pass' records or writings), 278 ('makes, alters, forges or counterfeits' or 'utters or passes, or tenders in payment' public securities or bank bills), 279 (to 'make, pass, utter or publish' fictitious bills or notes), 280 ('connects together' parts of several bills), 401 (to 'steal, embezzle, alter, corrupt, withdraw, falsify or avoid,' 'take off, discharge or conceal,' 'forge, deface or falsify,' or 'alter, deface or falsify' public records).) In the context of section 17-3 *we see no intended distinction between issuing a document and delivering one. 'Issue' and 'deliver' have replaced words such as 'utter,' but without producing a change in essential meaning; '[t]he words "uttering" or "to utter" have a clear definition in law; they mean substantially "to offer" (People v. Katz* (1934), 356 Ill. 440, 445, [190 N.E. 913])' *(People v. Henderson* (1978), 71 Ill. 2d 53, 57, 373 N.E.2d 1338, 1340).

"Thus, . . . the conjunction 'or' connects broadly overlapping terms here. To be sure, to the extent that 'issue' and 'deliver' are synonymous, one of them becomes redundant. The defendant's suggestion that 'issue' be defined as a first delivery is subject to the same objection, however, for under that meaning 'issue' is totally subsumed by 'deliver.' " (Emphasis added.) *Stevens,* 128 Ill. App. 3d. at 826.

We believe that the Kansas Legislature likewise intended to retain the historical character of the crime of forgery when it replaced such words as "uttering or passing" with the words "issuing or delivering" and that it is reasonable to use "offer" in place of "utter." Moreover, the terms issuing and delivering were not intended to be separate and distinct material elements of the crime; rather, they merely describe the factual circumstances that would prove that the defendant offered a forged document to another, *i.e.,* uttered a forged document. *Cf. State v. Ahrens,* 296 Kan. 151, 160, 290 P.3d 629 (2012) (terms "operate" and "attempt to operate" in DUI statute merely describe factual circumstances by which material element of driving may be proved).

Because the legislature did not intend the phrase "issuing or delivering" in K.S.A. 21-3710(a)(2) to create alternative means of committing the crime of forgery, the district court's inclusion of that phrase in the jury instructions did not create a jury unanimity problem and does not demand application of the super-sufficiency requirement. See *Brown*, 295 Kan. at 196-97. Foster does not challenge the Court of Appeals' assertion that "[i]t is undisputed that Foster delivered the check to CheckSmart with the intent to cash it." *State v. Foster*, 46 Kan. App. 2d 233, 243, 264 P.3d 116 (2011). Moreover, the record supports that finding. Therefore, the panel's determination that the evidence was sufficient to support Foster's forgery conviction is affirmed.

Before concluding, we note that the latest version of the forgery statute is now found at K.S.A. 2012 Supp. 21-5823. Although not applicable here, the legislature made some changes in 2010, replacing the term "delivering" with "distributing" and providing a definition of "distribute" in the criminal code. See L. 2010, ch. 136, secs. 11(g), 109. A determination of the meaning of those changes must await another day.

Affirmed.